UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CHARLES BURGIN,

                Plaintiff,

      v.

PAMELA C. BROWN,
BARBARA SEALS-NEVERGOLD,
DONALD A. OLGOVIE, THERESA HARRIS-TIGG,
CARL PALADINO, JAMES M. SAMPSON,
CHARLES BRANDY, WILL KERESZTES,
PATRICIA PIERCE, LAWRENCE QUINN,
BUFFALO BOARD OF EDUCATION,
and L. NATHAN HARE,

                Defendants.

**DECISION AND ORDER**
15-CV-201S

# I. INTRODUCTION

Plaintiff Charles Burgin is the founder of Brotherman's Progress Mentors Matter Advocacy, a group dedicated to advocating for minority male students in the Buffalo, N.Y., public school system.   In 2013 and 2014, Burgin worked to have the Buffalo Board of Education adopt a mentoring program called "5000 Role Models of Excellence Project" in the Buffalo public schools.   After the Board of Education ultimately declined to adopt the program, Burgin sued here pro se on behalf of himself and at-risk minority male students and their parents, alleging a number of federal and state claims.   Defendants[1] moved to dismiss Burgin's amended complaint under Rules 12 (b)(1) and (6) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction (standing) and failure to state a

---

[1] Defendant Hare is not a party to the motion to dismiss: he filed an answer.   (Docket No. 25.) Nonetheless, for ease of reference, and because the reasons for dismissal discussed herein apply equally to Hare, this Court includes Hare in its reference to "Defendants".

claim upon which relief can be granted. (Docket No. 19.) With briefing fully completed and oral argument deemed unnecessary, this Court will grant Defendants' motion and afford Burgin 45 days to file a second amended complaint.

## II. BACKGROUND

### A.    Procedural History

On March 4, 2015, Burgin filed a 29-page handwritten complaint together with 176 pages of exhibits, which the Buffalo Board of Education promptly moved to dismiss on March 30, 2015. (Docket Nos. 1, 3.) The majority of remaining defendants moved to dismiss the complaint on August 26 and 27, 2015, after Burgin further accomplished service. (Docket Nos. 10, 12.) On December 15, 2015, Burgin responded in opposition to the pending motions and filed an amended complaint. (Docket Nos. 17, 18.)

Burgin's amended complaint is typed, but remains overly long, at 28 pages and 201 pages of exhibits. (Docket No. 18.) The amended complaint is a narrative of Burgin's interactions with the various defendants and others concerning his efforts to convince the Buffalo Board of Education to implement the "5000 Role Models of Excellence Project" program. (Id.) Burgin includes numerous detailed factual allegations, but fails to meaningfully tie them to his stated claims. (Id.) This failure, in part, lead to Defendants moving to dismiss the amended complaint on December 28, 2015. (Docket No. 19.) Briefing on that motion concluded on January 25, 2016, after which this Court deemed the initial motions to dismiss (Docket Nos. 3, 10, 12) moot in light of the filing of the amended complaint and reserved decision on Defendants'

December 28, 2015 motion to dismiss.[2]   (Docket Nos. 24, 27.)

**B.    Facts**

The following facts, drawn from Burgin's amended complaint, are assumed true for purposes of assessing Defendants' motion to dismiss for lack of standing and for failure to state a claim upon which relief can be granted.   See Crupar-Weinmann v. Paris Baguette Am., Inc., 861 F.3d 76, 79 (2d Cir. 2017); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Plaintiff Charles Burgin, an African-American male, is the founder of Brotherman's Progress Mentors Matter Advocacy, a group dedicated to advocating for minority male students in the Buffalo public school system.   (Amended Complaint, Docket No. 18, ¶¶ 5, 24, 73.)   He is also a volunteer in the Buffalo public school system, serving as chairman of the District Parent Coordinating Council Mentor Committee and as a 2011 superintendent-appointee on the Buffalo Public School Special Mentor Committee ("the Committee"), which was specifically tasked with creating and implementing district policies to establish a comprehensive mentor program.   (Id. at ¶¶ 6, 25, 27.)

In 2013, as part of his work on the Committee, Burgin discovered and researched a life-skills mentoring program designed for minority males (Black and Hispanic) created by Congresswoman Frederica S. Wilson (D-FL) called "5,000 Role Models of Excellence Project" ("the program").   (Id. at ¶¶ 7, 28.)   Burgin traveled to Washington, D.C., to learn

---

2 Although this Court denied the initial motions to dismiss as moot, it indicated that it would nonetheless consider the memoranda of law filed in conjunction with those motions (Docket Nos. 3, 17) as part of the briefing on Defendants' motion to dismiss the amended complaint (Docket No. 19), which this Court has done.

more about the program and to discuss with Rep. Wilson and the Executive Director the possibility of implementing the program in Buffalo.  (Id. at ¶¶ 7, 29, 40-41.)   Burgin thereafter set out to gather support for replicating the program in the Buffalo public schools, principally by contacting school officials and community leaders.  (Id. at ¶¶ 8, 30, 32, 33, 38, 39, 43, 44.)

On June 12, 2013, Buffalo Board of Education members Ralph Hernandez and Lou Petrucci sponsored a resolution calling on the superintendent to conduct an impact assessment of the program as the first step toward implementation.   (Id. at ¶¶ 36, 37.) The Board of Education passed the resolution and directed that a cost-analysis study and development of a business plan be completed as the next steps.   (Id. at ¶¶ 37, 38.)   Staff members of the Board of Education, including Defendant Charles Brandy, were tasked with conducting the cost-analysis study; Burgin was tasked with developing the business plan.  (Id. at ¶¶ 37, 38, 42, 43, 65.)

According to a November 12, 2013 Committee memorandum concerning implementation of the program sent by Brandy to Defendant Will Keresztes, Associate Superintendent of Educational Services, the Committee convened five times in September and October 2013 to determine the feasibility of implementing the program. (Id. at ¶ 45 and Exhibit SS.)   Brandy explained to Keresztes that Burgin had provided the Committee with multiple letters of support from area leaders and other materials related to the program.  (Amended Complaint, Exhibit SS.)   Brandy also relayed that the Committee explored piloting the program in one elementary school and one secondary school, with a focus on 10 of the 25 components of the program.  (Id.)

4

Brandy further advised Keresztes that the Committee determined that the pilot program would take place during the third marking period of the 2013-2014 school year, upon completion of a four-component action plan. (Id.) The first component of the action plan tasked Burgin with contacting the director of the program to discuss the program's components and ask specific questions developed by the Committee. (Id.) Brandy informed Keresztes, however, that Burgin had failed to participate in the final Committee meeting and had "ceased all communication." (Id.) Brandy therefore advised Keresztes that "[the program] is not recommended for implementation in the Buffalo Public Schools in a limited or full capacity at this time . . . Specifics of the program's core components remain unknown." (Id.)

Burgin alleges that the contents of Brandy's memorandum are false and that he did not cease communication or fail to provide information. (Id. at ¶ 45.) After the issuance of this memorandum, Burgin met with Defendant Superintendent Pamela Brown on December 4, 2013, to explain the inaccuracies in Brandy's memorandum and to provide further information, but Brown refused to accept Burgin's written materials and dismissed his efforts to bring Rep. Wilson to Buffalo to help implement the program. (Id. at ¶ 46 and Exhibit SS.)

Burgin claims that Brandy prepared the false memorandum in conjunction with Defendant L. Nathan Hare and presented it to Brown through Keresztes so that Hare's organization, Erie County Community Action Organization, could contract with the Buffalo Public Schools to provide a different mentoring program. (Id. at ¶¶ 9, 11, 15, 45, 46, 47, 70.) He further claims that Hare conspired to stop the cost-analysis study ordered by the

Board of Education as part of a "fraud" by Hare, Brandy, Keresztes, Brown, and other defendants designed to undermine Burgin's and the Committee's chances of implementing the program.  (Id. at ¶¶ 9, 11, 47, 48, 50, 70.)  By doing so, Defendants "act[ed] to deny Black plaintiff and minority parents of at-risk male students attending Buffalo Public Schools their rights to establish a proven mentor program for Black and Hispanic at-risk male students that helps them stay in school, graduate and attend college—the 5,000 Role Models of Excellence Project."   (Id. at ¶ 50.)

Dissatisfied with Defendant Brown and Defendants continued failure to adopt the program, Burgin appeared at an April 9, 2014 Board of Education meeting to further voice his complaints.   (Id. at ¶ 53.)   He claims that when he spoke to "let the public and T.V. audience know how the Superintendent, board employees and individual board members were violating the rights of [Burgin], Black and Hispanic parents of at-risk students and stakeholders," Defendant Barbara Seals-Nevergold directed security to remove him from the meeting.   (Id.)

### III. DISCUSSION

Cognizant of the distinct disadvantage that pro se litigants face, federal courts routinely read their submissions liberally and interpret them to raise the strongest arguments that they suggest.   See Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972); Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994).   Since Burgin is proceeding pro se, this Court has considered his amended complaint and other submissions accordingly.

Though somewhat difficult to decipher, Burgin appears to assert four federal claims

on behalf of himself and at-risk minority male students and their parents: Fourteenth Amendment (equal protection and due process) and First Amendment claims under 42 U.S.C. § 1983 (Amended Complaint, ¶¶ 16, 24, 52, 53) and race-discrimination claims under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) (id. at ¶ 52).   He also asserts equal protection and due process claims under the New York constitution (¶¶ 16, 24, 52), a state interference-with-contract claim (id. at ¶ 52), and claims asserting violations of various state education policies and regulations (id. at ¶¶ 17, 19, 20, 24, 55, 61).

As noted, Burgin purports to bring these claims on behalf of himself and at-risk minority male students and their parents (see id. at ¶¶ 1, 24, 52, 61) and seeks to maintain this suit as a class action, with the class to include "minority parents of minority males attending Buffalo Public Schools whose educational prospects for graduation would be enhanced by participating in 5,000 Role Models of Excellence Project Buffalo Chapter," (Amended Complaint, Wherefore Clause, ¶ C).   He further seeks a declaratory judgment ordering the Buffalo Board of Education and superintendent to implement the program and injunctive relief requiring the Defendants to cease discriminating against at-risk minority males.   (Id. at ¶¶ D, K.)   Finally, he seeks $1 million in compensatory damages against the Buffalo Board of Education; $5 million in compensatory damages against each individual defendant (excluding Defendant Hare); $5 million in punitive damages against the Buffalo Board of Education and each individual defendant (excluding Defendant Hare); and $10 million in compensatory damages and $15 million in punitive damages against Defendant Hare.   (Id. at ¶¶ E-I.)

Defendants move to dismiss each of Burgin's causes of action for lack of subject-matter jurisdiction (standing) and failure to state a claim upon which relief can be granted.

## A. Burgin lacks standing to bring claims on behalf of third-party at-risk minority male students and their parents.

The plaintiff, as the party seeking to invoke the court's jurisdiction, bears the burden of demonstrating proper subject-matter jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189, 56 S. Ct. 780, 785, 80 L. Ed. 1135 (1936); Scelsa v. City Univ. of N.Y., 76 F.3d 37, 40 (2d Cir. 1996). In turn, a defendant may assert lack of subject-matter jurisdiction as a defense under Rule 12 (b)(1), which permits dismissal of an action if the "district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

When a defendant asserts lack of constitutional standing as the jurisdictional defect, the motion is properly brought under Rule 12 (b)(1). See McKay v. New York, 16-CV-6834-FPG, 2018 WL 1046792, at *2 (W.D.N.Y. Feb. 26, 2018) (citing All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 87-88 n.6 (2d Cir. 2006)). In assessing a Rule 12(b)(1) motion, the court accepts as true all material factual allegations in the complaint, but does not draw inferences favorable to the party asserting jurisdiction. See J.S. *ex rel.* N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004); Shipping Financial Svcs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998). The court may also consider affidavits and other materials beyond the pleadings, but may not rely on conclusory or hearsay statements. See J.S., 386 F.3d at 110.

Defendants argue that Burgin lacks constitutional standing because he does not have a legally protected interest at stake. See Lujan v. Defs. of Wildlife, 504 U.S. 555,

560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Constitutional standing derives from Article III of the Constitution, which limits "judicial power" to actual "cases" and "controversies." U.S. Const. art. III, § 2. It is a doctrine rooted in the traditional understanding of this limitation. See Spokeo, Inc. v. Robins, __ U.S. __, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016). As recently explained in Spokeo, constitutional standing developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood" by limiting "the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Id.; see also Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."). Thus, in every federal case, the plaintiff must have standing to sue. Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S. Ct. 2301, 2308, 159 L. Ed. 2d 98 (2004).

The "irreducible constitutional minimum" of standing requires three elements. Lujan, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 136 S. Ct. at 1547; see also Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990); Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998) (citing Ne. Fl. Contractors v. City of Jacksonville, 508 U.S. 656, 663, 113 S. Ct. 2297, 124 L. Ed. 2d 586 (1993)).

An injury in fact is "an invasion of a legally protected interest which is (a) concrete

and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal citations omitted). A "concrete" injury is one that is "'de facto'[,] that is, it must actually exist . . . [it is] 'real' and not 'abstract,'" although an injury need not be tangible to be concrete. Spokeo, 136 S. Ct. at 1548. To be "particularized," an injury "must affect the plaintiff in a personal and individual way." Id. at n.1; see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982) (noting that the plaintiff must personally suffer an actual or threatened injury). For prospective relief, "a plaintiff must show a likelihood that he will be injured in the future," Carver v. City of N.Y., 621 F.3d 221, 228 (2d Cir. 2010) (citation and internal quotation omitted), and that the future injury is "certainly impending, and real and immediate," Lee v. Bd. of Governors of the Fed. Reserve Sys., 118 F.3d 905, 912 (2d Cir. 1997) (citations and internal quotation omitted).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing these elements for each claim.[3] See FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990). The plaintiff meets this burden at the pleading stage by "clearly alleg[ing] facts demonstrating each element." Spokeo, 136 S. Ct. at 1547. When assessing constitutional standing, courts do not examine the merits of the claims, but rather, determine "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court

---

3 Standing is claim-specific. That is, a plaintiff must have standing for each claim he or she pursues. See Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011) (noting that a plaintiff "must demonstrate standing for each claim and form of relief sought") (quoting Baur v. Veneman, 352 F.3d 625, 642 n. 15 (2d Cir. 2003)).

jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth, 422 U.S. at 498-99. Standing is therefore determined "irrespective of the merits of substantive claims." Bordell v. Gen. Elec. Co., 922 F.2d 1057, 1060 (2d Cir. 1991).

Rather than determine Burgin's constitutional standing, this Court addresses his claims on the merits below. This is because when the contested basis for standing is also an element of the plaintiff's claim—here Defendants argue lack of a legally protected interest—courts assume subject-matter jurisdiction and move to an examination of whether the plaintiff states a claim upon which relief can be granted. See Montgomery v. Cuomo, 14-CV-6709 CJS, 2018 WL 1157171, at *36 n. 168 (W.D.N.Y. Mar. 5, 2018) (citing Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187, 1189 (2d Cir. 1996)).

As it relates to Burgin's representative capacity, Defendants argue that Burgin lacks prudential or third-party standing to bring claims on behalf of at-risk minority male students and their parents. Burgin counters that his status as a volunteer on the Committee, as a "parent representative," as a parent of a graduate of the Buffalo public schools, and as the grandparent of a current Buffalo public schools student confers proper standing.

Prudential standing is separate from constitutional standing. It holds that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 498-99; Powers v. Ohio, 499 U.S. 400, 410, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). But there are exceptions to this general prohibition. A plaintiff can assert claims on behalf of a

third party if three criteria are met: "[1] the litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; [2] the litigant must have a close relation to the third party; and [3] there must exist some hindrance to the third party's ability to protect his or her own interests." Powers, 499 U.S. at 410-11 (citing Singleton v. Wulff, 428 U.S. 106, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976)).

Burgin lacks prudential and third-party standing. Accepting all allegations in the amended complaint as true, Burgin did not suffer an injury in fact. Very simply, the Board of Education's failure to adopt the program caused Burgin no harm: He was not a student or employee of the Buffalo public schools. He was not a parent of a male minority at-risk student (or any other student) in the Buffalo public schools. He did not develop or own the program. He had no financial or property interest in the program. As a volunteer— one of several on the Committee—Burgin simply worked to get the program adopted in the Buffalo public schools. While it is clear from the amended complaint that Burgin is exceedingly displeased with Brandy's November 12, 2013 memorandum and the manner in which the Committee and the Board of Education operated as it relates to consideration of the program, on the facts as pleaded, Burgin suffered no legally cognizable injury in the course of the Committee's work or by the Board of Education's failure to adopt the program. Moreover, nowhere in the amended complaint does Burgin plead a close relation to any third party[4] nor does he allege any hindrance that would prevent any one

---

4 In this papers, Burgin asserts that his "grandchild presently attends" the Buffalo public schools. This allegation is not pleaded in the amended complaint, nor is it clear whether this grandchild is an at-risk minority male.

of the at-risk male students or their parents from protecting their own interests.   Burgin

therefore lacks standing to assert representative claims.

**B.      Burgin cannot maintain a class action.**

Burgin seeks to maintain this suit as a class action, with the class to include

"minority parents of minority males attending Buffalo Public Schools whose educational

prospects for graduation would be enhanced by participating in 5,000 Role Models of

Excellence Project Buffalo Chapter."   (Amended Complaint, Wherefore Clause, ¶ C.)   It

is well settled, however, that pro se litigants cannot act as representatives of a class.

See, e.g., Iannaccone v. Law, 142 F.3d 553, 558 (2d Cir. 1998) ("[B]ecause pro se means

to appear for one's self, a person may not appear on another person's behalf in the other's

cause."); Frank v. Aaronson, 120 F.3d 10, 10 n. * (2d Cir. 1997) ("[Plaintiff] is not an

attorney and hence is not permitted to represent a potential class."); 28 U.S.C. § 1654

(providing for pro se litigants to "conduct their own cases personally").   This case is

therefore properly considered as an individual action only.

**C.      Burgin fails to state federal claims upon which relief can be granted.**

Rule 12 (b)(6) allows dismissal of a complaint for "failure to state a claim upon

which relief can be granted."   Fed. R. Civ. P. 12 (b)(6).   Federal pleading standards are

generally not stringent: Rule 8 requires only a short and plain statement of a claim.   Fed.

R. Civ. P. 8 (a)(2).   But the plain statement must "possess enough heft to show that the

pleader is entitled to relief."   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 127 S. Ct.

1955, 167 L. Ed. 2d 929 (2007).

When determining whether a complaint states a claim, the court must construe it

liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. ATSI Commc'ns, 493 F.3d at 98. Legal conclusions, however, are not afforded the same presumption of truthfulness. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). Labels, conclusions, or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged. Iqbal, 556 U.S. at 678. The plausibility standard is not, however, a probability requirement: the pleading must show, not merely allege, that the pleader is entitled to relief. Id. at 1950; Fed. R. Civ. P. 8 (a)(2). Well-pleaded allegations in the complaint must nudge the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

A two-pronged approach is thus used to examine the sufficiency of a complaint, which includes "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits." Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004). This examination is context specific and requires that the court draw on its judicial experience and common sense. See Iqbal, 556 U.S. at 679. First, statements that are not entitled to the presumption of truth, such as conclusory allegations, labels, and legal conclusions,

are identified and stripped away.  See id.  Second, well-pleaded, non-conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief."  Id.  "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to state a claim.  Id.

Burgin asserts four federal claims: Fourteenth Amendment (Equal Protection and Due Process) and First Amendment claims under 42 U.S.C. § 1983 [5] (Amended Complaint, ¶¶ 16, 24, 52, 53) and race-discrimination claims under Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) (id. at ¶ 52).  As pleaded, however, each of these causes of action fails to state a claim upon which relief can be granted.

First, as to Burgin's due process claim, the Fourteenth Amendment provides, in pertinent part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. XIV.  Two broad categories of due process claims exist—substantive and procedural.  A substantive due process claim is based upon the deprivation of a constitutionally protected life, liberty, or property interest. See B.D. v. DeBuono, 130 F. Supp. 2d 401, 431 (S.D.N.Y. 2000).  A procedural due process claim is based upon the deprivation of a protected life, liberty, or property interest, without notice and an opportunity to be heard.  Id. at 432-33.

---

[5] Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws.  See 42 U.S.C. § 1983. To properly plead a cause of action under § 1983, a plaintiff's complaint must include allegations that the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  Whalen v. County of Fulton, 126 F.3d 400, 405 (2d Cir. 1997); Hubbard v. J.C. Penney Dep't Store, 05-CV-6042, 2005 WL 1490304, at *1 (W.D.N.Y. June 14, 2005).

With respect to any due process claim, "[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." Narumanchi v. Bd. of Trs. of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988). Property interests protected by the Constitution arise out of "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits," such as those arising out of state law. Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). Such property interests may include continuation of or eligibility for public benefits, tenure, and public employment contracts. See id. at 576-77 (citing cases). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it . . . He must have more than a unilateral expectation of it . . . He must, instead, have a legitimate claim of entitlement to it." Id. at 577. Liberty interests protected by the Constitution include "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness by free men." Id. at 572 (quoting Meyer v. Nebraska, 262 U.S. 390, 399, 43 S. Ct. 625, 626, 67 L. Ed. 1042 (1923)).

Even affording the amended complaint a liberal reading as required, Burgin fails to allege a property or liberty interest protected by the Constitution. Rather, Burgin simply alleges that he was one of several members of a committee tasked with studying mentorship programs for at-risk minority males for possible adoption by the Buffalo public

school system.   Burgin had no legally protected interest in the adoption of the program: he had no personal interest in the program; he had no employment interest in the program; he had no financial interest in the program; and he had no entitlement to have his favored program implemented.[6]   Burgin simply wanted the Board of Education to adopt the mentoring program that he discovered and favored.   This desire, however, does not raise a due process claim.   See Looney v. Black, 702 F.3d 701, 706 (2d Cir. 2012) ("A 'unilateral expectation' is not sufficient to establish a constitutionally protected property right.") (citing Roth 408 U.S. at 577).   As such, Burgin's Fourteenth Amendment due process claim must be dismissed because Burgin has not pleaded a protected property or liberty interest in adoption of the program.

Second, as to Burgin's equal protection claim, the Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend. XIV, § 1.   It is "essentially a direction that all persons similarly situated be treated alike."   City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985); see also Sound Aircraft Servs., Inc. v. Town of E. Hampton, 192 F.3d

---

6 At various points in this papers, Burgin argues his interest in contract terms, stating that "he accepted an offer," "they made an agreement," and he had an "oral business agreement" with Rep. Wilson.   (Docket No. 17, p. 2; Docket No. 23, p. 3.)   Similar terms appear in the amended complaint.   (See Amended Complaint, ¶ 7 ("accepted an offer"); ¶ 52 (Defendants denied Burgin "the opportunity to contract").)   Burgin also describes the Board of Education's directive to prepare a "business plan."   (See, e.g., Amended Complaint, ¶¶ 37, 42, 52.)   What is clear from the amended complaint, however, is that the "agreement" and "oral contract" related simply to Rep. Wilson's willingness to help Burgin in his efforts to bring the program to Buffalo.   Burgin had no formal contract with Rep. Wilson or any other enforceable agreement that would give rise to a property right.   And further, according to Burgin's own allegations, any "contract" to eventually be entered would be between the program and the Board of Education, not Burgin. Consequently, Burgin fails to state an interest protected by the Fourteenth Amendment.

17

329, 335 (2d Cir.1999) ("[a]t its core, equal protection prohibits the government from treating similarly situated persons differently").  The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).

A "traditional" equal protection claim "protects against [classification-based] discrimination," such as race or national origin.  Inturri v. City of Hartford, 365 F. Supp. 2d 240, 248 (D.Conn. 2005).  Two other related equal protection claims are also recognized.  See Cobb v. Pozzi, 363 F.3d 89, 109 (2d Cir. 2004).  First, in Vill. of Willowbrook v. Olech, the United States Supreme Court recognized a "class of one" claim. 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000).  Second, in LeClair v. Saunders, the Second Circuit recognized an equal protection claim based on malicious or bad faith intent to injure.  627 F.2d at 609-10.  At a minimum, each theory requires a plaintiff to demonstrate that he or she was treated differently from other similarly situated individuals.

Here, although Burgin pleads that he is African-American, his amended complaint is devoid of any allegations that he was treated differently than a similarly situated individually *because of* his color or race.  Burgin does not plead that he was treated differently than another person, or that a similarly situated person even existed, or that

18

any differential treatment he may have experienced was motivated by his color or race. Burgin therefore fails to state an equal protection claim under any theory.

Third, as to Burgin's First Amendment claim, "[u]nder the prevailing constitutional framework, speech restrictions imposed by the government on property that it owns are analyzed under a 'forum based approach.'" Hotel Emps. & Rest. Emps. Union, Local 100 & Vicinity, AFL CIO v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 544 (2d Cir. 2002) (quoting Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678, 112 S. Ct. 2701, 120 L. Ed. 2d 541 (1992)). A "limited" public forum exists "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." Travis v. Owego–Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir. 1991).

A board of education meeting is a limited public forum. See Jones v. Bay Shore Union Free Sch. Dist., 947 F. Supp. 2d 270, 278 (E.D.N.Y. 2013) ("Typically, school board meetings are limited public fora."); accord Hotel Emps., 311 F.3d at 545 (listing a school board meeting as an example of a limited public forum) (citing City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n, 429 U.S. 167, 174-76, 97 S. Ct. 421, 50 L. Ed. 2d 376 (1976)). "'[I]n a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre.'" Hotel Emps., 311 F.3d at 545-46 (quoting Travis, 927 F.3d at 692). As for speech falling outside the specified categories for which the forum has been opened, "restrictions need only be viewpoint neutral and reasonable." Id. at 546. But the government may not, even in a

limited forum, "regulat[e] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829, 115 S. Ct. 2510, 2516, 132 L. Ed. 2d 700 (1995).

The allegations underlying Burgin's First Amendment claim are sparse. He alleges that Defendants denied him "an opportunity to be heard at a [Board of Education] 'speakers list' meeting held on April 9, 2014." (Amended Complaint, ¶ 53.) He alleges that after he "started reading his speech to [the] audience and public television audience about the negative conduct of board members while further demanding that the board meet with him," Defendant Seals-Nevergold ordered security to remove him from the meeting. (Id. at ¶ 72.) Burgin alleges that he was escorted out of the meeting "under a policy and custom of not publicly letting anyone speak out against any named board member or the superintendent who have aggrieved them." (Id. at 53.)

Burgin's allegations fail to state a First Amendment claim. He does not allege that he was an approved speaker at the April 9, 2014 board meeting (e.g., a registered speaker) or that he was attempting to speak about a subject that was on the meeting agenda. See Travis, 927 F.2d at 692. Rather, he alleges that he attempted to "speak out" against the board members and superintendent to expose their "shutting down the board ordered impact study/cost analysis" for the program. (Amended Complaint, ¶ 72.) Unless mentoring programs or the "impact study/cost analysis" study or some other related issue was a topic of the April 9, 2014 meeting, and Defendants prevented Burgin from speaking on that topic because of the content of his remarks, none of which Burgin

alleges, he fails to state a First Amendment claim in this context.   See Rosenberger, 515 U.S. at 829.

Finally, as to Burgin's statutory race-discrimination claim, 42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."   "To state a claim of discrimination under Title VI, the plaintiff must plausibly allege, inter alia, that the defendant engaged in discrimination based on race, the discrimination was intentional, and the defendant's discriminatory intent was a substantial or motivating factor for its actions."   Perez de Leon-Garritt v. State Univ. of N.Y. at Buffalo, No. 14-CV-456S, 2014 WL 7384221, at * (W.D.N.Y. Dec. 29, 2014) (citing Roggenbach v. Touro Coll. of Osteopathic Med., 7 F. Supp. 3d 338, 347 (S.D.N.Y. 2014)).

Nowhere in the amended complaint does Burgin plead that he was excluded from participating in or subjected to race discrimination in a federally-funded program.   And nowhere does Burgin plead that he was discriminated against *because of* his race, or that such discrimination was intentional, or that Defendants' actions were motivated by unlawful discrimination.   Instead, Burgin appears to assert this claim on behalf of the at-risk minority youth for whom the program was intended, which, as noted above, he lacks standing to do.   Burgin therefore fails to state a claim under § 2000d.

**D.    This Court declines to exercise supplemental jurisdiction over Burgin's state-law claims.**

Having disposed of Burgin's federal claims, this Court finds it appropriate to decline to exercise supplemental jurisdiction over Burgin's state law claims.   See 28 U.S.C. §

1367 (c)(3).  The United States Supreme Court has instructed that courts should ordinarily decline to exercise supplemental jurisdiction in the absence of federal claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) (noting that in the usual case where all federal claims are eliminated before trial, the relevant factors informing the decision of whether to exercise supplemental jurisdiction will "point towards declining to exercise jurisdiction over the remaining state-law claims"); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

The Second Circuit shares this view: where "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003); see also Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well.")

Burgin's remaining claims, to the extent they are cognizable, require interpretation of state law alone, and are thus more appropriately determined in state court in the interests of comity and efficiency.  Accordingly, this Court declines to exercise supplemental jurisdiction over Burgin's state law claims.  They are instead dismissed without prejudice under 28 U.S.C. § 1367 (c)(3).

**E**.     **Burgin is granted leave to file a second amended complaint.**

Although Burgin's amended complaint is deficient and subject to dismissal for all of the reasons stated above, the Second Circuit has directed that pro se litigants be given the opportunity to amend their complaints at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated."  Thompson v. Carter, 284 F.3d 411, 416 (2d Cir. 2002) (citing Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)).  Although it seems unlikely that Burgin could state Fourteenth Amendment or § 2000d claims, he may be able to state a valid First Amendment claim, depending on the facts and circumstances of the April 9, 2014 school board meeting.  Accordingly, this Court will dismiss Burgin's amended complaint, but grant him 45 days in which to file and serve a second amended complaint that complies with the requirements of Rule 15. Burgin is advised that his second amended complaint will replace and supersede his amended complaint, which will no longer have legal effect.  See Dluhos v. Floating & Abandoned Vessel, Known as New York, 162 F.3d 63, 68 (2d Cir. 1998); see also Bennett v. Fletcher, 9:17-CV-849 (GTS/CFH), 2018 WL 557885, at *1 (N.D.N.Y. Jan. 18, 2018). The second amended complaint must therefore be a complete pleading without incorporation of previous complaints.  See Local Rule 15 (a) of the Local Rules of Civil Procedure for the Western District of New York.

## IV. CONCLUSION

For the reasons stated above, this Court finds (1) that Burgin lacks standing to assert claims on behalf of third-party at-risk minority male students and their parents, (2) that Burgin cannot maintain this suit as a class action, (3) that Burgin fails to state federal

claims upon which relief can be granted, (4) that the relevant factors weigh against exercising supplemental jurisdiction, and (5) that Burgin should be afforded the opportunity to file a second amended complaint. Consistent with these findings, Defendants' motion to dismiss will be granted.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion to Dismiss (Docket No. 19) is GRANTED.

FURTHER, that Plaintiff is granted leave to file a second amended complaint within 45 days of the entry date of this Decision and Order.

FURTHER, that Plaintiff's failure to file an Amended Complaint within 45 days of the entry date of this Decision and Order will result in Plaintiff's case being dismissed and closed without further order of this Court.

SO ORDERED.

Dated:      April 24, 2018
             Buffalo, New York

                                  /s/William M. Skretny
                                 WILLIAM M. SKRETNY
                            United States District Judge